J-S11001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY | : | |
| OFFICE OF CHILDREN, YOUTH AND | : | |
| FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 1507 WDA 2025 |
| | : | |

Appeal from the Order Entered November 3, 2025
In the Court of Common Pleas of Allegheny County
Family Court at No: CP-02-DP-0000214-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: C.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY | : | |
| OFFICE OF CHILDREN, YOUTH AND | : | |
| FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 1508 WDA 2025 |
| | : | |

Appeal from the Order Entered November 3, 2025
In the Court of Common Pleas of Allegheny County
Juvenile Division at No: CP-02-DP-0000215-2025

IN THE INTEREST OF: A.W., A MINOR  :  IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: ALLEGHENY COUNTY  :
OFFICE OF CHILDREN, YOUTH AND  :
FAMILIES  :
:
:
:
:  No. 1509 WDA 2025
:

Appeal from the Order Entered November 3, 2025
In the Court of Common Pleas of Allegheny County
Juvenile Division at No:  CP-02-DP-0000216-2025

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED: May 27, 2026**

The Allegheny County Office of Children, Youth and Families ("CYF") appeals from the November 3, 2025 orders dismissing the dependency petitions filed with respect to J.W., a male, born in March of 2021; C.W., a female, born in August of 2018; and A.W., a male, born in September of 2022 (collectively, "the Children").  After careful review, we vacate and remand.

**FACTUAL AND PROCEDURAL HISTORY**

The record reveals that this family came to the attention of CYF on April 8, 2025, when it received a report alleging that four-year-old J.W. was being sexually abused by J.W. ("Father").  **See** N.T., 10/31/25, at 57, 60-61. Father and H.W. ("Mother," collectively with Father, "Parents") are married and resided together with the Children at all times relevant to this matter.  **See**

*id.* at 34, 81. On April 25, 2025, the trial court granted CYF emergency protective custody of the Children and ultimately placed them in kinship foster care separately with their paternal aunts, H.S. and B.R.[1] The court held a shelter care hearing on April 30, 2025, wherein it confirmed CYF's custody of the Children.

On May 14, 2025, CYF filed petitions for dependency pursuant to 42 Pa.C.S.A. § 6302(1). The petitions alleged as follows, in relevant part:

5. On April 8, 2025, CYF received a report regarding J.W. being sexually maltreated by Father. J.W. disclosed to Mother that Father sexually maltreated him. Mother contacted the police[,] and J.W., along with Mother, were transported to Children's Hospital of Pittsburgh.

6. On April 8, 2025, J.W. was interviewed at Children's Hospital by forensic interviewer, Rick Dibello. J.W. made a clear and consistent disclosure of sexual maltreatment by Father.

7. On April 8, 2025, Mother was interviewed. Mother stated that this morning she was giving J.W. a bath and noticed a "bump" on his penis. Mother asked J.W. about it, and J.W. described Father touching the private places on his body. Mother reported J.W. also stated that Father told him not to tell Mother. Mother was informed of what J.W. said during his interview and she stated that she would be protective of the Children by going to stay with a relative today and would be petitioning the courts for a [protection from abuse ("PFA")] order.

8. On April 16, 2025, Allegheny County Police [Department ("ACPD")] Detective Nelson Kirksey [("Detective Kirksey")] criminally charged Father for sexually maltreating J.W. . . .

---

[1] Initially, the court placed the Children together with H.S. However, on May 27, 2025, the court granted a motion filed by CYF to remove C.W., the oldest child, and placed her with B.R.

9. During the course of the investigation, Mother did not follow through with her initial statements about protecting J.W. and his siblings. Detective Kirksey stated that Mother sent him a cell phone video of J.W. recanting his statements from the interview at Children's Hospital. Detective Kirksey searched Mother's phone[,] and upon further assessment, he believed Mother coerced the statement from J.W.

10. ACPD discussed multiple times with Mother about scheduling C.W. to be forensically interviewed[,] and she failed to schedule it. Mother's actions have caused CYF and ACPD to have serious concerns for her ability to keep J.W. and his siblings safe from Father and could negatively impact the criminal investigation.

*See* Dependency Petitions (J.W.), (C.W.), (A.W.), 5/14/25, at 3 (cleaned up).

We note, however, that CYF's petition with respect to J.W. did not seek a finding that he is a victim of "child abuse" pursuant to 23 Pa.C.S.A. § 6303. Dependency Petition (J.W.), 5/14/25, at 3.

The trial court granted five separate requests to continue the evidentiary hearing, which it ultimately held on October 31, 2025. The Children, who were then seven, four, and three years old, respectively, were represented at the hearing by a guardian *ad litem* ("GAL"). Parents were present and similarly represented by counsel.

CYF presented the testimony of Mr. DiBello, Detective Kirksey, and Nicholas Zdral, CYF caseworker supervisor.[2] Mother did not testify, but

---

[2] We observe that, in lieu of presenting four-year-old J.W. as a witness, CYF requested that the court admit his sexual abuse disclosures as an exception to the evidentiary rule against hearsay pursuant to 42 Pa.C.S.A. § 5985.1 ("Admissibility of certain statements."). After hearing testimony related to the matter, the court granted CYF's request. *See* N.T., 10/31/25, at 5-30.

- 4 -

presented the testimony of Janelle Crisp, her nonoffender's treatment counselor. Father testified on his own behalf. He also presented the testimony of B.W. ("Paternal Grandmother"); H.S., paternal aunt; and Ju.W., Father's seventeen-year-old son from a prior relationship. The GAL presented the testimony of B.R., another paternal aunt, and recalled Mr. Zdral.

The only exhibit the court admitted into the record was a video proffered by Father, and recorded by Mother, of J.W. recanting the allegations at some point during the week after they were made, as alleged in the dependency petitions ("the recantation video").[3] The record reveals that Father introduced the video during his direct examination of H.S. **See** N.T., 10/31/25, at 88. The court played the recantation video in open court, but the record does not include its content.

The trial court summarized the evidence adduced at the hearing in its 1925(a) opinion as follows:

> Richard DiBello . . . testified that he interviewed J.W. on April 8, 2025. . . . J.W. identified his "wee-wee" as "the part that he uses to pee." J.W. further disclosed to Mr. Dibello that Father "licked his wee-wee with his tongue on multiple occasions" and

---

[3] We note with displeasure that this exhibit is not included in the certified record. Although this does not hamper our meaningful review, we pointedly remind CYF that, as the appellant, it "has the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." **Commonwealth v. Wint**, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); **see also** Pa.R.A.P. 1921 Note (stating, "Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

that the incidents took place on a red couch in a garage at the house where he lived with his family. J.W. also reported that Father touched J.W.'s penis with his own, describing it as giving a "high five" and inserted a finger inside J.W.'s buttocks. According to J.W., his sister, C.W., was present when these incidents occurred [("sexual abuse allegations")].

. . .

This court also heard testimony from [Detective] Kirksey. . . . Detective Kirksey testified that he became involved with J.W. and the family on April 8, 2025, the day of the forensic interview. Police interviewed Father later that day and, after consulting with the Office of the District Attorney, determined that charges needed to be filed. Subsequent to charges being filed, Father was arrested and detained. A few weeks later, the charges were withdrawn against Father.

. . .

Detective Kirksey testified that there were concerns about Mother. She had been very emotional throughout the forensic interview process. Police tried to get in touch with her a day or two after the interview, but she was checking herself into UPMC Western Psychiatric Hospital at the time. . . . Throughout the investigation, Mother changed whose side she was on.

. . .

Nicholas Zdral . . . testified that the initial April 8, 2025 referral came from two sources [and were both] related to sexual maltreatment [of J.W.]. . . . On April 16, 2025, CYF discovered that Father had returned to the residence [which he left after the allegations were made]. . . . Mother expressed to CYF that she let Father back into the home because she was torn over whether to believe the sexual maltreatment allegations.

. . .

This court also heard testimony from Paternal Grandmother. She testified that Mother asked her to bring Father's daughter from a prior relationship [("K.W.")] to C.W.'s fourth birthday party. Upon their arrival at the party, Paternal Grandmother could see Mother yelling and pointing her finger at K.W. Mother told

Paternal Grandmother that K.W. raped C.W. When Paternal Grandmother asked Mother to explain exactly what K.W. did, Mother said "everything possible." K.W. was nine at the time.

H.S., [the Children's paternal aunt,] also provided testimony. . . . She described Mother as someone who could manipulate situations. H.S. and her sister used to supervise visits, but they stopped due to a concern that the Children were being manipulated. For example, after court or visits, J.W. was instructed [by Mother] to "just cry" if the judge asked him questions. . . .

This court also heard testimony from Father. . . . He testified that Mother did not treat the Children well when they were together. He asked her to get mental health treatment numerous times over the span of four years. Father believed that Mother coached J.W. and put things into his head.

The last witness to provide testimony was [another paternal aunt,] B.R. . . . C.W. told B.R. that K.W. did not "touch my privates." C.W. also told B.R. that she said "no" when Mother repeatedly asked her if K.W. touched her inappropriately.[4] . . .

Trial Court Opinion, 12/22/25, at 2-8 (unpaginated; cleaned up; footnotes omitted) (citing N.T., 10/31/25, at 33-34, 44-45, 49, 53-54, 56-60, 78-81, 86-87, 99-100, 107-08).

With respect to Father's testimony, we further note that he stated that Mother's mental health deteriorated over the last few years. *See* N.T., 10/31/25, at 99. Father and his seventeen-year-old son, Ju.W., stated that, on a typical day, Mother would constantly scream at the Children. *See id.* at

_____

[4] As best we can discern, Mother's allegations that K.W. sexually abused C.W. were never reported to CYF or ACPD. We glean that the consensus among the family members was that the allegations were untrue. *See* N.T., 10/31/25, at 78-81, 100, 107.

- 7 -

97, 99. Father testified about text messages that Mother sent him in the days leading up to his arrest, wherein she (1) expressed suicidal ideations; (2) stated that she cannot care for the Children; and (3) admitted to needing professional treatment. ***See id.*** at 103. These text messages were not introduced or admitted into evidence. ***See id.*** at 101-03. Rather, the court instructed Father to testify to the general content of the text messages from his memory. ***See id.***

At the conclusion of the hearing, the trial court found on the record in open court that CYF failed to prove the sexual abuse allegations by clear and convincing evidence. ***See*** N.T., 10/31/25, at 117-22. However, as to Mother, the court found that "there's significant evidence of mental health issues" which it stated were "sufficient to sustain a dependency petition." ***Id.*** at 118. Finally, the court found that CYF failed to demonstrate that Father was not immediately available to provide the Children with proper parental care or control. ***See id.*** at 118-19.

By orders dated October 31, 2025, and entered on November 3, 2025, the trial court declared the Children not dependent, dismissed the dependency petitions pursuant to Pa.R.J.C.P. 1409(a)(2)(i), and discharged CYF's custody of the Children pursuant to Pa.R.J.C.P. 1409(a)(2)(ii). Notably, the court did not enter an order identifying who will have the legal and physical custody of the Children. ***See*** Pa.R.J.C.P. 1409(a)(2)(iii). In fact, the trial court stated

on the record in open court that it was "not comfortable releasing the [C]hildren just straight into" Father's care. N.T. 10/31/25, at 120.

CYF timely filed notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] This Court consolidated CYF's appeals *sua sponte*. The trial court filed a Rule 1925(a) opinion.

### ISSUES

On appeal, CYF presents the following issues for our review:

1. Did the trial court abuse its discretion when it permitted Father's attorney to present and admit undisclosed and discoverable evidence, including documentation and testimony, without providing all counsel an opportunity to inspect or prepare prior to the hearing?

2. Did the trial court err as a matter of law by failing to apply the correct legal standard of clear and convincing evidence during the October 31, 2025 hearing?

3. Did the trial court abuse its discretion by failing to find the Children dependent as to Parents and dismissing the dependency petition despite having clear and convincing evidence that the Children are without proper parental care or control?

4. Did the trial court abuse its discretion or err as a matter of law by finding the Children dependent as to only one parent, expressing substantial concern about protective capacity and mental health, and nevertheless failed to adjudicate the Children as dependent?

---

[5] CYF's separate notices of appeal each included all three of the Children's names and docket numbers. This Court entered an order on December 12, 2025, directing CYF to file amended notices of appeal pursuant to **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018). CYF timely complied.

CYF's Brief at 5-6 (cleaned up; reordered for ease of disposition).

**STANDARD OF REVIEW AND RELEVANT LAW**

The standard of review in dependency matters is as follows:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination as opposed to the findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In the Interest of A.W.*, 162 A.3d 1117, 1120 (Pa. Super. 2017) (citation omitted).

Dependency hearings are governed by the Juvenile Act, 42 Pa.C.S.A. § 6301-6365, and involve a two-stage process. *See In the Interest of S.D.*, 334 A.3d 919, 925 (Pa. Super. 2025). The first stage requires that the court determine whether the child is dependent after hearing the evidence on the petition. *See* 42 Pa.C.S.A. § 6341(a). Section 6302 defines a "dependent child," in part, as a child who:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other

custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1).[6]

Further, our Supreme Court has explained:

The definition of a dependent child contained in [S]ection 6302 clearly states that a child must lack a parent, guardian, or other legal custodian who can provide appropriate care to the child. A child whose non-custodial parent is ready, willing, and able to provide such care does not meet this definition.

*In re M.L.*, 757 A.2d 849, 851 (Pa. 2000).

This Court has further explained, as follows:

[A] child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available. Proper parental care has been defined as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child. The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is immediately available. In answering the first question, the paramount concern is the welfare of the child at the time of the hearing. In answering the second question, it may be necessary for the hearing court to look to the future.

A finding that a child is dependent requires proof by clear and convincing evidence, *i.e.*, testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue. If the court finds a child dependent, it proceeds to the second stage of the dependency process, which requires an appropriate disposition based on the best interest of the child pursuant to [S]ection 6351 (a) and ([c]). **See** 42 Pa.C.S.A. § 6341(a), (c).

---

[6] We note that of the ten subsections regarding the definition of a dependent child, this is the only subsection that CYF pled in the dependency petitions.

- 11 -

***S.D.***, 334 A.3d at 926 (some internal citations and quotation marks omitted).

This Court has recognized that the legislature has "defined dependent child in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further[,] the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case." ***In re R.J.W.***, 826 A.2d 10, 15 (Pa. Super. 2003) (citation and internal punctuation marks omitted). "Indeed, a hearing judge's inquiry should be comprehensive and searching, and his decision supported by a full discussion of the evidence. If the hearing judge does not comply with these requirements, on appeal the case will be remanded for further proceedings." ***In the Int. of J.R.***, 333 A.3d 446, 452 (Pa. Super. 2025) (citation omitted).

Further, we have explained that the trial court's comprehensive and searching inquiry "should be a wholistic one. This Court has specifically noted the definition of a dependent child is intended to be flexible and to encompass the myriad circumstances that may cause a child to be without proper parental care or control." ***In the Int. of K.B.***, 331 A.3d 50, 59 (Pa. Super. 2025) (citations and internal punctuation marks omitted).

If the trial court determines that a child is not dependent, the following provision of the Pennsylvania Rules of Juvenile Court Procedure is applicable:

Rule 1409.  Adjudication of Dependency and Court Order

**(a)** Adjudicating the Child Dependent. Once the court has made its findings under Rule 1408, the court shall enter an order whether the child is dependent.

. . .

**(2)** *No Dependency.* If the court finds the child not to be dependent or the court finds a parent ready, willing, and able to provide proper parental care or control, the court shall:

**(i)** dismiss the petition;

**(ii)** order the child to be discharged from custody and any restrictions ordered in the proceedings; and

**(iii)** enter an order identifying individual(s) who will have the legal and physical custody until such order is modified by further order of the court.

. . .

Pa.R.J.C.P. 1409(a)(2) (some capitalization omitted).

## LEGAL ANALYSIS

### A.  Evidentiary Claims

In its first issue, CYF argues that the trial court abused its discretion by admitting evidence into the record that was not disclosed prior to the hearing, thereby violating Pa.R.J.C.P. 1340.  **See** CYF's Brief at 34-38.  Specifically, CYF asserts that the court erred by: (1) permitting Father to call Parental Grandmother as a witness; (2) admitting the recantation video into evidence; and (3) allowing Father to testify regarding the above-described text

messages between himself and Mother.  *See id.*  CYF is not entitled to relief on these claims.

Pa.R.J.C.P. 1340 provides, in pertinent part, as follows:

Rule 1340.  Discovery and Inspection

. . .

**B.** Mandatory disclosure.

**(2) *By all other parties.*** All other parties shall provide discovery to the county agency and all other parties and shall disclose, all of the following requested items or information that the party intends to use at a hearing, provided they are material to the instant case unless disclosure is prohibited by law. The party shall, when applicable, permit the county agency to inspect and copy or photograph such items:

**(a)** the names and last known addresses of each witness who is expected to testify;

. . .

**(c)** any     tangible     objects,     including     documents, photographs, or other tangible evidence;

. . .

**(e)** any other evidence that a party intends to introduce at a hearing.

Pa.R.J.C.P. 1340.

With respect to Paternal Grandmother's testimony, CYF asserts that, upon Father calling Paternal Grandmother as a witness, it lodged an objection to her testimony on the basis that Father did not disclose her as a witness in violation of Rule 1340.  *See* CYF's Brief at 36.  However, the record reveals no such objection.  *See* N.T., 10/31/25, at 78-79.  Rather, CYF requested an

- 14 -

offer of proof concerning Paternal Grandmother's testimony, which Father's attorney provided. *See id.* Following this offer of proof, the trial court then directed Father's attorney to proceed with the direct examination of Paternal Grandmother, and CYF failed to object. *See id.*

The Pennsylvania Rules of Evidence provide that "a party may claim error in a ruling to admit . . . evidence only" if the party "makes a timely objection" on the record and "states the specific ground" upon which the party objects. Pa.R.E. 103(a)(1)(A)-(B). Furthermore, it is axiomatic that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Because CYF failed to lodge any objection to Paternal Grandmother's testimony on the basis of Father's violation of Rule 1340, this evidentiary claim is waived on appeal. *See id.*; Pa.R.E. 103(a)(1)(A)-(B).

Turning to the recantation video, which CYF also argues Father failed to disclose prior to the hearing in violation of Rule 1340, Father's counsel introduced the video during the direct examination of H.S. after she testified that Mother had sent it to her. *See* N.T., 10/31/25, at 88-89. CYF objected to the admission of the video solely based upon a lack of authentication. *See id.* at 89 (CYF's counsel objecting that H.S. "is not the authenticating party" for the video). Because CYF failed to raise the specific ground in the trial court that it now advances on appeal, its claim regarding the recantation video is waived. *See Commonwealth v. Youngster*, ___ A.3d ___, 2026 WL 274721,

*20-24 (Pa. Super. 2026) (holding that the appellant waived an issue pursuant to Pa.R.A.P. 302(a) when he objected on a different ground in the trial court than his claim on appeal); *see also Commonwealth v. Berrios*, 297 A.3d 798, 805 (Pa. Super. 2023) ("[A] new and different theory of relief may not be successfully advanced for the first time on appeal.").

Regarding the text messages between Parents, which CYF again argues were not disclosed before the hearing, our review of the record reveals that the at-issue messages were not offered or admitted into evidence. *See* N.T., 10/31/25, at 101-03. Specifically, CYF objected to Father reading directly from these messages during his testimony because CYF had not seen the messages prior to the hearing. *See id.* The trial court appears to have sustained this objection inasmuch as it responded to CYF's objection by directing Father to cease reading and summarize the messages from his memory alone.[7] *See id.* Thus, CYF's first issue fails.

### B. Sufficiency of the Evidence

We address CYF's remaining issues collectively because they are interrelated. CYF argues that the trial court abused its discretion in failing to

---

[7] Certainly, Father can testify to the general sentiments of the text messages that were sent between him and Mother, as he had personal knowledge of the events. *See* Pa.R.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

- 16 -

adjudicate the Children dependent because it satisfied its evidentiary burden regarding the sexual abuse allegations against Father. *See* CYF's Brief at 18-34. Even if it failed to prove the sexual abuse allegations, CYF argues that the trial court abused its discretion because the evidence demonstrated that (1) Mother's mental health was unstable; (2) Father was aware of Mother's mental health issues and had requested that she obtain treatment; and (3) Mother did not obtain mental health treatment, but Father left the Children alone with her anyway. *See id.* at 23-28, 30-34. Therefore, CYF argues that the Children are presently without proper parental care or control, and such care or control is not immediately available. *See id.* at 18-34.

The Children's GAL filed a participant's brief advocating for this Court to reverse the orders dismissing the petitions for dependency. *See* GAL's Brief at 10-20. Specifically, the GAL argues that "the evidence demonstrated that Father has had longstanding concerns with Mother's mental health and has left the [C]hildren unsupervised in her care despite these growing concerns." *Id.* at 20.

Mother filed an appellee brief advocating for this Court to affirm the trial court's orders. *See* Mother's Brief at 19-41. Mother acknowledges the trial court's concern for her mental health issues but argues that the court did not abuse its discretion in dismissing the dependency petitions because CYF failed to meet its evidentiary burden regarding the sexual abuse allegations. *See id.* Further, Mother argues that there is no evidence of any other parental

incapacity of Father. *See id.* Therefore, Mother argues that the trial court did not abuse its discretion in determining that Father is a ready, willing, and able parent for the Children. *See id.*

Likewise, Father filed an appellee brief in support of the orders on appeal. *See* Father's Brief at 1-7. Father contends the trial court did not abuse its discretion because CYF failed to satisfy its evidentiary burden with respect to the sexual abuse allegations. *See* Father's Brief at 1-5. Further, Father baldly asserts that the court did not abuse its discretion by failing to grant the petitions on the basis of Mother's unstable mental health and his lack of protective capacity because they were not averred in the petitions. *See id.* Moreover, Father contends that the record does not contain any evidence regarding the same. *See id.*

### i. Sexual abuse allegations

With regard to the sexual abuse allegations, the trial court found as follows on the record and in open court:

> I think where I am after considering all of the evidence in this adjudicatory hearing is that I'm essentially 50-50 on whether this sexual maltreatment happened or not[.]
>
> . . .
>
> So we start with [J.W.] being brought to the hospital following an alleged disclosure to [Mother]. [Mother] is the witness to that disclosure, but then I have some other behaviors by [Mother] which suggest . . . [J.W.'s] disclosure may not be reliable, and [J.W.]'s [disclosures are] not reliable enough on his own to carry the case.

N.T., 10/31/25, at 117-18, 120. We discern no abuse of discretion.

- 18 -

Clearly, the court was unable to come to a clear conviction regarding the truth of J.W.'s sexual abuse allegations. **See S.D.**, 334 A.3d at 926 (clear and convincing evidence requires "testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue."). It is beyond cavil that the trial court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations[.]" **In re R.A.M.N.**, 230 A.3d 423, 427 (Pa. Super. 2020).

The record evidence supports the court's findings. As described above, Paternal Grandmother and B.R., the Children's paternal aunt, provided testimony that Mother had falsely accused Father's nine-year-old daughter, K.W., of sexually abusing C.W., then four years old, which was approximately three years before the subject hearing. **See** N.T., 10/31/25, 79-81, 107. To the extent that this false accusation from Mother caused the trial court to doubt the veracity of Mother's report of J.W.'s sexual abuse allegations and further question whether Mother coerced J.W. into making the allegations, we discern no abuse of discretion. **See** Trial Court Opinion, 12/22/25, at 15 (unpaginated).

Further, Detective Kirksey testified that the criminal charges against Father were withdrawn due to lack of evidence. **See** N.T., 10/31/25, at 46, 52. Detective Kirksey explained that, during Father's initial interview at ACPD headquarters, he took a voluntary polygraph test and "was able to leave that

night." *Id.* at 38. Both Mr. DiBello and Detective Kirksey testified that then four-year-old J.W. made a "spontaneous" admission during the forensic interview that "sometimes I make things up." *Id.* at 40-41, *see also id.* at 37-38, 43, 52. Further, J.W. disclosed during the interview that the alleged sexual abuse occurred while then six-year-old C.W. was in the same room. *See id.* at 34, 38-39, 53. Detective Kirksey testified that the ACPD interviewed C.W. with respect to the sexual abuse allegations, and she did not indicate that she witnessed the alleged abuse. *See id.* at 53. Further, B.R., the paternal aunt who C.W. is currently placed with, stated that she specifically asked C.W. if she saw Father "doing anything" to J.W., and C.W. said she had not. *Id.* at 112-13. Finally, Detective Kirksey, Mr. Zdral, Ms. Crisp, Mother's nonoffender's counselor, and the Children's other paternal aunt, H.S., all testified that Mother wavered as to whether she believed the sexual abuse allegations during the simultaneous investigations of CYF and ACPD. *See id.* at 49, 59-60, 72, 92.

Based upon the foregoing testimony, we discern no abuse of discretion by the trial court concluding that CYF failed to meet its evidentiary burden with respect to the sexual abuse allegations. *See S.D.*, 334 A.3d at 926. Thus, this aspect of CYF's argument merits no relief.

### ii. Mother's mental health

Initially, we recognize that CYF did not aver Mother's mental health concerns and Father's corresponding lack of protective capacity as a basis for

the Children's dependency. ***See*** Dependency Petitions (J.W.), (C.W.), (A.W.), 5/14/25, at 3. As detailed above, Father consequently argues that the trial court was prohibited from considering this evidence in determining whether the Children are dependent. ***See id.***; ***see also*** Father's Brief at 1-7. We disagree. ***See In re J.J.***, 69 A.3d 724, 729-30 (Pa. Super. 2013) (holding that the trial court did not abuse its discretion in adjudicating the children dependent pursuant to Section 6302(1) by considering evidence not averred in the dependency petitions, namely, the father's history of domestic abuse, substance abuse, and criminal conduct).

With respect to Mother, the trial court found:

> I think as it relates to [Mother], there's significant evidence of mental health issues. . . . sufficient to sustain a dependency petition.

> . . .

> So that leaves us with one parent who I think the [C]hildren are dependent to and one who the [C]hildren are not dependent to, which means the petition gets dismissed.

> . . .

N.T., 10/31/25, at 118-20. As stated above, the trial court dismissed the subject petitions and discharged the Children from CYF's custody but did not enter an order identifying who will have legal and physical custody of the Children pursuant to Rule 1409(a)(2)(iii). ***See*** Orders of Adjudication, (J.W.), (C.W.), (A.W.), 10/31/25.

The record amply supports the court's finding that Mother suffers from mental health problems which caused the Children to be without proper parental care or control necessary for their physical, mental, or emotional health, or morals. Father testified that, over the past four years, he has asked Mother "many times" to get mental health treatment. N.T., 10/31/25, at 99. He testified that Mother's mental health has "progressively" worsened over the years. *Id.* Father testified that he received the above-described text messages from Mother on an unspecified date, but after J.W. made the sexual abuse allegations and before his arrest. *See id.* at 103. Upon inquiry by the trial court, Father testified as follows:

> The Court: So this is the period after the allegations were made before you were arrested. [Mother] generally was texting you and saying what?
>
> A: I don't think I can take care of the kids.
>
> The Court: Just give me a general idea.
>
> A: **[Mother is] sorry[,] and she's suicidal[,] and she ruins everything[,] and she can't take care of the kids and needs professional help.**

*Id.* (emphasis added). Father testified that he believed that Mother "inadvertently coached [J.W.] and put these things in his head . . . just like she did with [C.W. concerning the prior allegation against K.W.]." *Id.* at 100.

With respect to Mother's prior allegation against K.W., B.R., with whom C.W. resides in kinship care, testified that C.W. told her that K.W. "didn't touch my privates." *Id.* at 107. B.R. testified that she asked C.W. "why would

anyone say that [K.W.] did?" *Id.* C.W. replied, "My mommy just kept following me around the house asking, asking, asking, asking, asking." *Id.* B.R. testified that she asked C.W. if she told Mother "no," to which C.W. replied that she did. *Id.* Relatedly, H.S., the other paternal aunt, testified that she "worries" about Mother's sense of "reality and what's true and what's false." *Id.* at 87.

We further note, as discussed above, that Mother voluntarily committed herself into Western Psychiatric Hospital one or two days after J.W. made the sexual abuse allegations. *See id.* at 49, 58. Thus, the record amply supports the trial court's conclusion that the Children are without proper parental care or control necessary for their physical, mental, or emotional health, or morals with respect to Mother.

### iii. Father's protective capacity and ability to immediately provide proper parental care or control

As mentioned above, the trial court dismissed the dependency petitions based on concluding that CYF did not meet its burden of proof regarding the sexual abuse allegations. Further, the court reasoned that it "could not determine that Father was unable to provide proper parental care." Trial Court Opinion, 12/22/25, at 18 (unpaginated). The trial court explained:

> But as it relates to [Father], the county has not put on anything else. . . . I haven't heard any evidence of mental health history, drug and alcohol history, errant behavior, strange behavior that would suggest that the [C]hildren are dependent as to him.

N.T., 10/31/25, at 118-119.  However, in contradictory fashion, the trial court stated that it was "not comfortable releasing the [C]hildren just straight into" Father's care.[8]  N.T. 10/31/25, at 120.

In determining that Father is ready, willing, and able to provide proper parental care or control of the Children, the trial court relied upon ***In the Int. of S.C.***, 304 A.3d 764 (Pa. Super. 2023) (unpublished memorandum).  ***See*** Trial Court Opinion, 12/22/25, at 15-17 (unpaginated).  In ***S.C.***, the panel affirmed the order dismissing the dependency petition and granting sole custody of the child to the father, who was the non-custodial parent and lived separately from the mother.  ***See S.C.***, 304 A.3d at *1-4, 21.  In that case, the dependency petition alleged that the child was dependent pursuant to Section 6302(1) because the father sexually abused the child, and the mother was addicted to illegal drugs.  ***See id.*** at *3-4, 7.  By the date of the dependency hearing, it had been determined that the allegations against the father were unfounded, and the agency had no further concerns about the father's ability to care for the child.  ***See id.*** at *4.  Therefore, prior to evidence being presented at the dependency hearing, the agency requested that the court dismiss the dependency petition and grant the father sole custody.  ***See id.*** at *8-11.  The dependency hearing proceeded with respect to the mother's

---

[8] As mentioned above, the trial court failed to enter an order identifying Father as the individual having legal and physical custody of the Children as required by Rule 1409(a)(2)(iii).  We conclude that the trial court erred by failing to comply with this provision.

- 24 -

ability to provide proper parental care or control of the child. *See id.* at \*16-18. There is no indication in *S.C.* that any questions arose during the dependency hearing with respect to whether the father is immediately available to provide proper parental care or control. *See id.* at \*6-12, 16-20.

In contrast, in this case, Father testified during the dependency hearing that he was aware of Mother's mental health issues for the four years preceding the dependency petitions and further acknowledged that her mental health was continually deteriorating over that time. *See* N.T., 10/31/25, at 99. However, Father knowingly left the Children in the care of Mother, during which time Mother involved two of the children, C.W. and J.W., in disclosing seemingly false allegations of sexual abuse. We reiterate that, as detailed above, after J.W. made the sexual abuse allegations, Mother sent text messages to Father that she was suicidal and unable to take care of the Children. *See id.* at 103. Unlike the father in *S.C.*, there is no evidence in this record that Father is immediately available to protect the Children's physical, mental, or emotional health, or morals from the consequences of Mother's mental health issues. In this case, Father and Mother are husband and wife and resided together with the Children up until the time of Father's arrest, and there is no evidence of where he currently resides.[9] *See id.* at

---

[9] Father left the home once the sexual abuse allegations were made, but Mother had allowed him to return shortly before his arrest approximately one week later. *See* N.T., 10/31/25, at 105-06. The record does not specify
*(Footnote Continued Next Page)*

34, 81. We further note that, in contrast to **S.C.**, the trial court here specifically declined to enter an order granting Father legal and physical custody of the Children pursuant to Rule 1409(a)(2)(iii). **See** N.T. 10/31/25, at 120.

## CONCLUSION

In sum, we conclude that **S.C.** is not persuasive in this instance. Here, questions arose during the dependency hearing about whether Father is immediately available to provide proper parental care or control of the Children in light of Mother's unstable mental health, but the trial court failed to perform a comprehensive and searching inquiry into these questions. **See In the Int. of K.B.**, 331 A.3d 50, 57 (Pa. Super. 2025) (stating that a court "in a dependency proceeding must conduct a comprehensive and searching inquiry into the record" because it is "necessary to ensure the trial court has a comprehensive view of the matter, is aware of all relevant concerns, and makes an informed decision.") (citations omitted); **see also J.R.**, 333 A.3d at 452 (explaining that if a trial court fails to conduct this inquiry, the case will be remanded on appeal).

Accordingly, we vacate the orders and remand to the trial court for an evidentiary hearing to determine whether Father is immediately available to provide proper parental care or control necessary for the Children's physical,

---

where Father has lived since the criminal charges were withdrawn. **See id.** at 50, 52.

mental, or emotional health, or morals.  In so doing, the trial court shall conduct a "comprehensive and searching" inquiry, and its decision shall be "supported by a full discussion of the evidence" and comply in all respects with Pa.R.J.C.P. 1409.  *J.R.*, 333 A.3d at 452; *see also K.B.*, 331 A.3d at 57.

Orders vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/27/2026